Robert B. REICH, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

HAEMONETICS CORPORATION, Defendant.

Civ. A. No. 94–10789–RCL.

United States District Court, D. Massachusetts.

Dec. 19, 1995.

Albert H. Ross, John S. Casler, Karin Froom, U.S. Department of Labor, Office of Solicitor, Boston, MA, for Robert B. Reich, Secretary of Labor, U.S. Department of Labor.

David B. Ellis, James W. Bucking, Foley, Hoag & Eliot, Boston, MA, for Haemonetics Corporation.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

LINDSAY, District Judge.

This case involves the interpretation of a provision of the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. § 201 *et seq.,* as applied to a group of employees (called "Business Analysts") of Haemonetics Corporation ("Haemonetics," the "company" or the "defendant"). The plaintiff, the Secretary of Labor (the "Secretary" or the "plaintiff"), contends that these Business Analysts do not fall within the "administrative exception" to the overtime provisions of the FLSA, 29 U.S.C. § 213(a)(1), and so are owed back-wages for overtime hours worked. The defendant, Haemonetics, contends that the Business Analysts are exempt from these overtime provisions, and that no back-pay is due. The parties agree that the sole issue in this case is the applicability of the administrative exception to this group of employees.

For the reasons set forth below, this court determines that the Business Analysts are exempt under 29 U.S.C. § 213(a)(1).

## I. Findings of Fact

Haemonetics manufactures and sells equipment for the separation of human blood into its components preparatory to reinfusion of the blood into surgical patients.[1] The equipment consists of electronic machinery that processes information and provides power for the collection, cleaning and separation of blood; and single-use utensils (called "disposables") for the transport and storage of the blood. The machines have a list price of $15,000 to $40,000; the disposables list at $15 to $210. Despite the machines' higher cost, the majority of Haemonetics' revenues are derived from the sale of disposables, because of the high volume of disposable sales. Neither machines nor disposables are regularly sold at their list prices. Most sales are negotiated by Haemonetics and the buyer; the price varies depending on the frequency with which the customer purchases disposables, the volume of disposables purchased, the competition in the geographical market in which the customer is situated, and the customer's potential for growth, as determined by Haemonetics. The company's customers are hospitals, blood banks, and commercial plasma centers.

The parties stipulated to the following facts, some of which are jurisdictional facts. The Business Analysts are compensated on a salary basis of at least $250 a week, and their primary duty consists of office or nonmanual work. They work an average of 47 hours per week. The Business Analyst position was created on June 1, 1994. Before that date, some of the duties performed by the Business Analysts were performed by "Customer Service Analysts." The parties disagreed as to the extent of this congruity and its importance.

The Business Analysts' job is broadly separable into two categories: "structuring deals" and "special projects." Structuring deals takes more of the Business Analysts' time on a day-to-day basis and is the more important of the two functions from the company's point of view. However, as the nature of both aspects of the Business Analyst position is important to the analysis under 11 U.S.C. § 213(a)(1), the court will discuss both.

### A. Structuring Deals

As mentioned above, the prices for Haemonetics' equipment are not predetermined. Although there are standard "list prices" for the equipment, neither the machines nor the disposables customarily, if ever, sell at these prices. Instead, sales are individually negotiated, and the terms of each customer's deal are different, depending on the customer. Haemonetics' customers can buy their machines in one of three ways: they may buy them outright, lease them, or buy through a "usage plan." Under a usage plan, the customer pays for the machine over time by way of a surcharge on the cost of disposables purchased. The majority of Haemonetics' customers buy their machines through usage plans.

The Business Analysts play an integral role in the process of determining the price Haemonetics will charge each customer for the equipment purchased. If the customer is buying through a usage plan, the Business Analyst is responsible, along with a company sales representative, for structuring the initial usage plan. If the customer wishes to renegotiate the usage plan during the course of the contract (as the typical customer does at least once), the Business Analyst is responsible for renegotiating the terms of the deal.[2] Further, it is the Business Analyst's

---

1. Haemonetics employees 1,300 persons. Of these employees, 475 work in the company's manufacturing operation, and 22 comprise its sales staff. The four Business Analysts work in the company's marketing department.

2. Renegotiation of a deal is often more complicated than structuring a deal in the first instance. In the case of a potential renegotiation, the Business Analyst must decide, on the basis of the customer's history with the original usage plan, whether it is appropriate even to recommend a renegotiation. Then the Business Analyst must consider all the variables normally involved in structuring a usage plan (as will be explained) and decide how the original usage plan can be restructured to meet the needs of both the customer and the company.

responsibility to track a customer's usage plan to see whether the customer is falling behind (using fewer disposables than predicted, thus paying for the machine more slowly than initially anticipated) or is ahead (using more disposables than predicted, and buying the machine more quickly).

The basic structure of a sales transaction is as follows: the sales representative (whose status under the FLSA is not at issue in this case) negotiates mutually-agreeable terms for a sale with a potential customer, then enters this information into a computerized spreadsheet. The sales representative then sends this spreadsheet to a Business Analyst via electronic mail ("e-mail"). When the Business Analyst opens the e-mail, he or she "unlocks" a second page of the spreadsheet by using a password. The sales representative does not have access to the second page of the spreadsheet.

Information on the second page of the spreadsheet includes the company's target gross margin for each product, the target revenue for each product, and the difference between the actual and target margins and revenues. This information (which is not input by the Business Analyst, but is pre-programmed into the spreadsheet) allows the Business Analyst to examine the sales representative's proposed deal in light of Haemonetics' revenue goals. Although the Business Analyst plays no role in determining the target revenue and target margin (one witness testified that these were set by Haemonetics' Chief Financial Officer or his office), he or she uses this information in deciding whether a proposed deal makes sense for the company. If the Business Analyst finds that this proposed sale does not make sense for the company, he or she may modify various terms in the deal (for example, by changing the kind of machines in the usage plan, or by using different disposables, or by extending or compressing the length of the contract, or by adjusting the prices of machines, disposables, or both) until a satisfactory outcome for the company is found.

The Business Analyst then proposes this modified plan to the sales representative. If the sales representative agrees to the modified plan, the plan is submitted for approval to the Manager of Marketing and Customer Support. Two of such managers testified that they accept the deals recommended by the Business Analysts 90–95% of the time. If the Business Analyst and the sales representative do not agree, both plans are submitted to the Manager of Marketing and Customer Support. The two managers who testified said that in the vast majority of the cases where there is disagreement, the managers will take the proposal of the Business Analyst over that of the sales representative.

Thus, the Business Analyst serves as a first-line, in-house reviewer of all proposed sales. In essence, the Business Analyst ensures that the sales representative does not put his or her desire to make a sale and earn a commission ahead of Haemonetics' bottom line. In performing this task, the Business Analyst may recommend a deal, based on his or her knowledge of the customer's business, that would result in short-term losses for Haemonetics, if the Business Analyst believes that the long-term interests of Haemonetics would be subserved by such a deal.

### B. Managing Trial and Evaluation Machinery and Special Projects

The part of a Business Analyst's day not spent on structuring deals is taken up with managing the company's inventory invested in "trial and evaluation" ("T & E") machines and with various "special projects."

T & E machines are those that Haemonetics has allowed a customer—or a prospective customer—to use on a trial basis. This allows the customer to "test drive" the machine for a while, under normal working conditions, to help the customer decide whether the machine fits his or her needs. At any given time, Haemonetics has approximately $5 million worth of its machines committed to T & Es. These T & E placements last for varying periods of time. Some may be extended indefinitely if the customer provides a steady demand for disposables. For Haemonetics' T & E customers, Business Analysts are responsible for proposing the initial plan for disposable sales and for tracking the customer's experience and use of the machine. While the equipment is on the customer's premises, the Business Analyst makes a

judgment about whether and how long to extend the T & E or whether to convert the T & E to an indefinite placement.

As for the special projects, they have included conceptualizing and writing the text for marketing brochures, managing the bidding process for vendors who print the brochures, overseeing the photography and approving the final design of the brochures, creating business review reports that analyze the company's business trends in various areas, managing and monitoring customers' compliance with their usage plans, and managing various other aspects of Haemonetics' public relations.

Another of the Business Analysts' tasks in the special projects category is to track upcoming conventions of doctors, nurses, and other users of Haemonetics' products and to determine to what extent Haemonetics should have a presence at those conventions. In connection with this task, the Business Analyst must decide how much space to rent, who will staff the Haemonetics display booth, and which displays and equipment will travel to the convention. If the Business Analyst chooses a particular person to staff the Haemonetics display booth at a convention, that person is obliged to staff the booth, unless his or her manager has an important reason that overrides Haemonetics' needs at the convention.

Business Analysts in the company's blood bank unit are also responsible for scheduling and staffing Haemonetics' clinical training. In connection with placement of its machines, Haemonetics offers its customers training in using the company's products. Desire for this training is significant, and Haemonetics' training resources are limited. The Business Analysts decide which clinical specialist will provide training for each account, based on customer need. If two customers request clinical specialists on the same day, the Business Analyst decides which customer gets priority. Business Analysts make these decisions based on their knowledge of the different accounts and their understanding of the various clinical specialists' skills. The Manager of Marketing and Customer Support for the Blood Bank Unit testified that she does not know precisely what factors the Business

Analysts consider in making these decisions, and that the decisions are made by the Business Analysts alone. Like the people who staff the booths at conventions, the clinical specialists must follow the schedule set by the Business Analysts.

The Company requires its Business Analysts to have at least a Bachelor's degree, preferably a degree in either science or business. The lowest paid Business Analyst earns $27,500 annually; the highest paid earns $30,338 annually. Each is eligible for an annual bonus of up to $2,000 based on job performance. The one current Business Analyst called as a witness testified that she regards her job as a professional one.

The Business Analysts are largely unsupervised in all of their day-to-day work. They establish their own priorities for their assignments and schedule and manage their own time.

The effectiveness of a Business Analyst is largely a reflection of how well he or she knows the customer and the customer's needs, how well he or she understands the company's business and its products, and how well he or she can match the customer's needs to the products made and sold by the company, to the end that both customer and company are satisfied.

## II. Conclusions of Law

Haemonetics' business is covered under the FLSA, 29 U.S.C. § 201 *et seq.* Section 213(a)(1) of 29 U.S.C. exempts from the overtime pay provisions of the FLSA "any employee employed in a bona fide executive, administrative, or professional capacity." In interpreting this provision, the courts are guided by caselaw and by the regulations and interpretations promulgated by the Secretary. The parties agree—and the court concludes—that the "short test" for administrative exemption, set forth at 29 C.F.R. § 541.2, governs this case. The short test states that an employee whose salary level is at least $250 weekly, "and whose primary duty consists of the performance of work described in paragraph (a) of this section, which includes work requiring the exercise of discretion and independent judgment, shall

be deemed to meet all the requirements of this section." 29 C.F.R. § 541.2(e)(2). The work "described in paragraph (a)" of the section is "office or nonmanual work directly related to management policies or general business operations" of the employer or the employer's customers. 29 C.F.R. § 541.2(a)(1).

■ The Supreme Court has spoken decisively as to the burden of proof in a case like this, in which the employer seeks to establish an exemption from the FLSA. As expressed by the First Circuit,

The employer in an FLSA case bears the burden of establishing that its employees are exempt, and because of the remedial nature of the FLSA, exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."

*Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995), *quoting Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). Thus, Haemonetics bears the burden of proving that the Business Analysts fall squarely within the description of exempt administrative employees.

The parties agree that the Business Analysts' work is "office or nonmanual." Thus, under the short test, this court is left to determine whether the Business Analysts' "primary duty" consists of "work directly related to management policies or general business operations" of the employer, and whether the work requires "the exercise of discretion and independent judgment." The court will take these two inquiries—discretion and judgment—in order.

*A. Primary Duty/Directly Related to Management Policies*

■ This prong of the "short test" requires two inquiries. First, the court must determine what the employees' "primary duty" is. Then the court must inquire whether that aspect of the position is "directly related to management policies or general

business operations of the employer." 29 C.F.R. § 541.2(a)(1).

■ In applying the administrative exemption, courts may turn for guidance to the Secretary's interpretations of the regulations. *Newspapers of New England,* 44 F.3d at 1070. The Secretary has issued an interpretation of "primary duty" under the regulations. That interpretation is that,

[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time.... Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if other pertinent factors support such a conclusion.

29 C.F.R. § 541.103. *See also Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir.1982) (questioning the usefulness of time-based analysis to determine "primary duty"). Among the other "pertinent factors" cited are "the frequency with which the employee exercises discretionary powers" and "his relative freedom from supervision." *Id.* One Court has defined "primary duty" as "what [the employee] does that is of principal value to the employer, not the collateral tasks that she may also perform...." *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1227 (5th Cir. 1990).

The most important part of the Business Analysts' job is structuring deals. Indeed, Haemonetics acknowledges that structuring, restructuring and recommending usage plans is the reason the Business Analyst position exists. The Business Analysts spend more than 50% of their time in that activity. Given these facts, the court concludes that the Business Analysts' "primary duty" is structuring deals.

The next inquiry is whether this duty is "directly related to management policies or general business operations of the employer." The Secretary's interpretations explain that,

[t]he phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activi-

ties relating to the administrative operations of a business as distinguished from "production" ... This phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business ...

29 C.F.R. § 541.205(a). Subsection (a) thus distinguishes between production employees and administrative employees.

Subsections (b) and (c) define other applicable considerations in the evaluation of whether an employee's job is "directly related to management policies or general business operations." Under subsection (b), the inquiry is whether the employee engages in various activities defined as "servicing" the business. Subsection (c) provides a test for "work of substantial importance to the management or operation of the business." These two tests will be taken up below, after consideration of the production/administrative distinction set forth in subsection (a).

The Secretary in this case argues that the Business Analysts fall on the "production" side of the "production/administrative dichotomy" set forth in this interpretation. Analogizing the employees at issue in this case to those in *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir.1991), *cert. denied* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992), the Secretary argues that Haemonetics' Business Analysts are in the business of "producing" sales for the company. He maintains that, like the inside salespersons in *Cooper Electric*, the Business Analysts are a cog in the machinery that produces sales for Haemonetics.

*Cooper Electric* is distinguishable on its facts. In that case, the appeals court cited with approval the district court's finding that " 'it is important to consider the nature of the employer's business' when deciding whether an employee is an administrative or production worker." *Cooper Electric*, 940 F.2d at 903. Cooper Electric Supply Company had stipulated that its business was "the sale of electrical products" and that its "primary business purpose" was to "produce sales of electrical products." *Id.* Because the thing produced by Cooper Electric was sales, it followed that the salespeople were in "production."

This reasoning does not apply to Haemonetics. As discussed above, Haemonetics is in the business of producing and then selling medical equipment. The company's "product" is not sales, but devices for the collection, cleaning, and separation of blood and blood products. Haemonetics employs factory workers and warehouse employees who can properly be classified as working in "production." *Cooper Electric* does not serve to make this classification apply to the Business Analysts.

Subsection (b) of the same interpretation offers a job description that seems well-suited to Haemonetics' Business Analysts. Under that subsection, "[t]he administrative operations of the business include the work performed by so-called white collar employees engaged in 'servicing' a business as, for, [sic] example, advising the management, planning, negotiating, ... promoting sales, ... and business research and control." 29 C.F.R. § 541.205(b). As described in the Findings of Fact above, the Business Analysts perform all of these functions.

Finally, subsection (c) defines as "directly related" work that is of "substantial importance to the management or operation of the business" when done by employees who "carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c). In analyzing whether an employee's work is of substantial importance, "it is necessary ... to look to 'the nature of the work, not its ultimate consequence.' " *Dalheim*, 918 F.2d at 1231, *quoting Clark v. J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir.1986).

"Job-related skill and knowledge" are insufficient to prove that an employee's job substantially affects the employer's business operations. *Cooper Electric*, 940 F.2d at 906. The court in *Cooper Electric* found that an inside salesperson's skill and knowledge did not justify a finding that the salesperson's position "substantially affected" the employer's business operations. *Id.* In this case, however, we are dealing not with salesper-

sons making routine sales, but with professionals whose success depends in large part on their ability to grasp the realities of the relevant market, negotiate with the sales representative and through the sales representative, with the customer, and structure a deal that ultimately benefits Haemonetics in the earning of revenues from which profits are derived. Thus, the court concludes that the nature of the Business Analysts' work is of "substantial importance" to Haemonetics.

Having found (1) that the Business Analysts' primary duty is structuring deals, and (2) that this activity is directly related to the management policies or general business operations of Haemonetics and of substantial importance to Haemonetics, the court concludes that the Business Analyst position satisfies the first prong of the short test.

### B. Discretion and Independent Judgment

The second prong of the short test requires an analysis of whether the Business Analysts use "discretion and independent judgment" in carrying out their duties. The Secretary's interpretations define "the exercise of discretion and independent judgment" as "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). The discretion that is contemplated by this part of the test is discretion that is "real and substantial, that is, ... exercised with respect to matters of consequence." 29 C.F.R. § 541.207(d)(1). In distinguishing precisely what sort of "discretion and independent judgment" is "real and substantial," the interpretations distinguish between "the kinds of decisions normally made by clerical and similar types of employees" and "the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise." 29 C.F.R. § 541.207(d)(2).

Haemonetics' Business Analysts regularly "formulate policy" and "commit their employer in substantial respects" by recommending sales prices and usage plans for new and current Haemonetics customers and by monitoring and altering existing usage plans.

The interpretations caution that a "frequent cause of misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects." 29 C.F.R. § 541.207(c)(1). The Secretary would have the court find that the primary work of the Business Analysts falls into the category of "skill." He argues that the Business Analysts "perform the 'line' function of providing customer service within a very limited scope of authority. They develop expertise in operating within [Haemonetics'] guidelines, and in using computers to apply [Haemonetics'] pre-set profit margins." Thus, the Secretary argues, the Business Analysts are merely "skilled" workers who do not exercise discretion in their work.

The court disagrees. As detailed above, the Business Analysts are responsible for monitoring use of expensive equipment and recommending decisions that directly affect the company's financial future. Although the Business Analysts do not have the ultimate authority to make these decisions, that does not defeat a finding that they exercise independent judgment and discretion. *Dymond v. United States Postal Serv.*, 670 F.2d 93 (8th Cir.1982). Although they are guided in much of this work by the company's pre-set target figures, the Business Analysts have the discretion even to suggest that Haemonetics enter into a deal that does not meet those profit margins. In other words, the Business Analysts have the discretion to suggest a deal that will lose money for Haemonetics in the short run if, in their opinion, that deal may lead to increased sales for the company in the future. Ninety to ninety-five percent of the time, the Business Analysts' suggestions are accepted.

In making the determination that the Business Analysts exercise "discretion and independent judgment," the court is guided by the Secretary's interpretations of the meaning of "discretion and independent judgment." In the discussion of the difference between "skill" and "discretion and independent judgment," the interpretations set forth

various examples of jobs in which skill might be mistaken for discretion. 29 C.F.R. § 541.207(c)(2). None of these positions resemble the job done by Haemonetics' Business Analysts.[3] Thus, the court concludes that the Business Analysts exercise discretion and independent judgment, and so meet the second prong of the short test.

*Ultimate Finding, Conclusion and Order*

In light of the foregoing findings of fact and conclusions of law, this court determines that Haemonetics' Business Analysts are exempt from the overtime wage provisions of the FLSA under 29 U.S.C. § 213(a)(1). Judgment shall therefore enter for the defendant.

SO ORDERED.

---

**3.** These jobs are "ordinary inspection work," "examiners or graders," " 'screening' of applicants by a personnel clerk," and "comparison shopping performed by an employee of a retail store" (which is distinguished from "the buyer who evaluates the assistants' reports and on the basis of their findings directs that certain items

be re-priced"—a job that *does* involve discretion and independent judgment, and that, in its tasks of considering the relevant market and pricing the employer's product accordingly, resembles the job of the Business Analyst). 29 C.F.R. § 541.207(c)(2)–(6).